**Arthur J. MORRIS, Jr., Appellant–Defendant**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 48A05–9210–CR–371.

Court of Appeals of Indiana, Fifth District.

Feb. 23, 1994.

William D. McCarty, Anderson, for appellant-defendant.

Pamela Carter, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

Arthur Morris appeals his conviction by a jury of one count of criminal deviate conduct and two counts of child molesting, for which he received an executed sentence of thirty-one years. Morris was convicted of various sexual acts he committed on his twelve-year-old step-daughter, M.B., during a two-week period from late October to early November, 1991, in the home of M.B.'s mother.

Morris argues, among other things, that he was denied effective assistance of counsel. We agree and remand for a new trial.

### DISCUSSION

Morris raises several alleged errors by counsel which he argues amount to ineffective assistance and require a new trial. Dispositive of this appeal, however, is whether counsel was ineffective for failing to object to testimony which is inadmissible under *Modesitt v. State* (1991), Ind., 578 N.E.2d 649. Specifically, Morris complains that Anderson Police Detective Dale Koons, Police Officer Darren Benson and M.B.'s mother were permitted to repeat at trial, without objection, M.B.'s out-of-court allegations against Morris. Detective Koons testified to his first interview with M.B. as follows:

A.  M.B. talked about there having been forced fondling by her step father, that she

had only lived in the home with her mother and step father for a short period of time, less than a month, that shortly after she lived there that her step father had taken a leave from work, I believe he called it a vacation, and it was during times that mother was absent from the home and only her and her brother and sister were in the home that he would begin to gradually force sexual behavior on her.... She verified what was in the report about the fondling and she also talked about forced oral behavior.

\* \* \* \* \* \*

She told me that [Morris] had forced her head upon ... and mouth upon his penis, which she called a do-hinky.

(R. 175–77). Detective Koons also related what M.B. told him at his second interview with her:

... I began to probe why she was upset. I learned she was afraid she was pregnant. She was afraid she might have twins and I asked her, "why do you think you might have twins" and she said, "because he did it to me more than once".

\* \* \* \* \* \*

She described a progression of things, one thing leading to another over a course of days. The parts that she had told previously about the forced fondling had led to the forced oral sex that she had to perform on him and then she was made to or he made her submit to his own oral behavior and affection towards her, where he would put his mouth on her breasts and he would put his mouth between her legs and gradually it came to a place where he was making her have intercourse with him. She would describe that the first time he attempted to do that that when he pulled up and pulled away from her this stuff squirted out on her.

(R. 195–96).

She talked about the second time they had intercourse that it ... she said it hurt like a shot right to her belly button and it made her cry and she thought that he had hurt her and she was real frightened about that. And then she talked about the weekend coming when her mom was going to be

off and how happy she was because she knew her mom would be there and those things wouldn't happen. And it was right after that weekend that she told the school authorities what was going on.

(R. 200). In addition, the State was permitted to place into evidence, through Detective Koons' testimony, again without objection, M.B.'s written statement to police, which provides in relevant part:

He [Arthur Morris] has been making me do sex with him at times when my mother was working. When Arthur did those things with me, my brother and sister were home, but always in another part of the house. It started happening when my step father was on his two week vacation from work a few weeks ago.... Arthur would do things when I was up after my brother and sister were gone to bed, or when they were playing in the basement, or when they were up stairs. Some of the time Arthur did those things in his bedroom, where he would be having me watch his dirty movies with him, and sometimes those things would happen in the living room, on the floor, when the movies were on the television. The kind of movies that Arthur had me watching were movies with men and women doing sex things, like putting their mouth on each other's privates, and men putting their privates inside the women. The first time that Arthur did anything to me was on a night right after he went on vacation, and I remember that it was on a school night. The other kids were already in bed, and Arthur had made me stay up with him watching the television in the living room. I was laying on the floor and Arthur laid down beside me. He moved real close and began rubbing against me. Then he put his hand down the front of my pants and started putting his fingers into my private. I tried to make him stop, but he was too strong. He turned me so that his front was against mine and was rubbing his private against mine. That is all he did the first time but the very next night that my mother was away he started doing those things again, but now started doing something new. Then he pulled my shirt

up, and then pulled my bra up so that my breasts were out. He was touching my breasts and tried to make me kiss him and tried to put his tongue in my mouth. I did not want his tongue in my mouth and did not let him do that. The next new thing he did was on the next night that my mother worked. Each time he would do everything he had done before plus something new. This time he sucked on my breasts as he rubbed against me. He moved down and started sucking on my butt, and I remember trying to push him away when he stopped. Sometimes he would stop the new things when I was trying to not do those things. For a couple of nights he did not do anything new, just the same things. He was making me French kiss him with his tongue in my mouth.... Before the first week of Arthur's vacation was over he was making me do other things. He made me put my mouth on his private. He made me do that for the first time in the kitchen. He had been wearing pants and pulled his private out and made me get on my knees and put my mouth on his private. His private was in my mouth and he was trying to make me move my head, and he was holding my head so that I could not take my mouth off his private. When he stopped he started touching my private under my clothing, putting his fingers into me. On another night he made me do the same thing when we were in the living room.... The next new thing he started doing was trying to put his private in mine. The first time he did that was in the living room, and he had pulled all my clothing off.... At one point he pulled up and squirted stuff from his private all over my private.... I think he was trying to make me have twins because he had already done that to me. This time it was on the living room floor again. This time his private was really pressing against mine hard.... [H]e made me do so many things that I don't think I can remember all.

(R. 243–44).

Anderson Police Officer Benson was dispatched to M.B.'s school to interview M.B. on the day M.B. told school personnel she had been molested. Officer Benson related his conversation with M.B. as follows:

> ... she told me that her step father, Arthur Morris, had just married her mother ... he was home for vacation for about a week and his mother or her mother ... was working. Arthur was home with [M.B.] and the two children, her younger brother and sister. They were all downstairs and she told me that Arthur had asked her to come upstairs, so she came upstairs and when she was upstairs Arthur grabbed her and started fondling her breasts. She struggled with him and he tried to put his hand down her pants.... [D]uring this week and a half these incidents happened about four or five times. She went on about a couple more where she said that, you know, when he was alone with her that he had made her touch his penis and, you know, I went in a little bit of detail about that and she said that, you know, he made her touch it for about five or ten minutes but she couldn't give any other detail about that..... And she told me about another incident where they were alone, she was in the kitchen and he pulled her up to the refrigerator, had her pinned up against there and stuck his hand down her pants and started touching her vagina and she said this happened over about a week to a week and a half and, you know, it happened about four or five times when she was alone with him.

(R. 286–88). The State also placed into evidence the statement of M.B.'s mother to the police. The statement recounted what M.B. told her mother that Morris had done to her. Finally, instead of conducting a direct examination of M.B. regarding her allegations against Morris, the State read M.B.'s previous statement to the police. Morris' counsel did not object to this procedure, but did cross examine M.B.

In order to prevail on his claim of ineffective assistance of counsel, Morris must show that 1) counsel's performance was deficient; and 2) the deficient performance prejudiced his defense. *Tyra v. State* (1991), Ind.App., 574 N.E.2d 918, *trans. denied.* In order to show that counsel was ineffective for failing to object to evidence, Morris must

show that a proper objection, if made, would have been sustained. *Siglar v. State* (1989), Ind., 541 N.E.2d 944; *King v. State* (1992), Ind.App., 598 N.E.2d 589, *trans. denied.* Morris argues that the evidence to which counsel failed to object would not have been admissible under *Modesitt*, 578 N.E.2d 649. According to Morris, the testimony served only to bolster the victim's testimony before she testified, thereby unfairly prejudicing him in the eyes of the jury.

If Morris' trial had been held before September 26, 1991, the date of the *Modesitt* opinion, our discussion would be governed by the rule set out by the supreme court in *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482. The *Patterson* court held prior out-of-court statements, not under oath, "were admissible as substantive evidence if the declarant was present and available for cross examination at the time of the admission of such statements." *Modesitt*, 578 N.E.2d at 651. Soon after the *Patterson* rule was announced, it became clear that it was subject to abuse in that it was used to support the admission of out-of-court statements as a substitute for in-court testimony. *See Samuels v. State* (1978), 267 Ind. 676, 372 N.E.2d 1186. Further, in the years following *Patterson,* the "simple rule" became clouded by exceptions and limitations. *See Modesitt,* 578 N.E.2d at 652. This led the supreme court to overrule *Patterson* in favor of the rule announced in *Modesitt,* 578 N.E.2d 649:

> In balance, we hold that, *from this point forward,* a prior statement is admissible as *substantive evidence only if* the declarant testifies at trial and is subject to cross examination concerning the statement, *and* the statement is (a) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, *or* (b) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, *or* (c) one of identifica-

tion of a person made after perceiving the person.

*Id.* at 653–54 (emphasis supplied). Morris' trial began on May 19, 1992; therefore, our discussion is governed by the rule announced in *Modesitt.*

There is no doubt here that M.B.'s out-of-court allegations were admitted as substantive evidence. Further, M.B. was subject to cross examination concerning her allegations against Morris. However, in order for her out-of-court allegations to be admissible the requirements of (a), (b), or (c) would have to be met. The requirements found in (a)—that the out-of-court statement be inconsistent with the declarant's testimony and the prior statement be made under oath—cannot be met because M.B.'s out-of-court allegations were not made under oath. Likewise, (b)—that the out-of-court statement be consistent with declarant's testimony and is used to rebut a charge of recent fabrication by the declarant—is not fulfilled because there was no charge of recent fabrication. Finally, M.B.'s out-of-court statements were not admitted for identification purposes as required by (c). M.B.'s out-of-court allegations were therefore inadmissible. Morris has successfully shown that a proper objection to the testimony, if made, would have been sustained.

The prejudice inherent in permitting witnesses to testify to the victim's out-of-court accusations against the defendant was explained by the supreme court in *Modesitt:*[1]

> Here, by putting into evidence the victim's out-of-court charges against Modesitt by three separate and repetitive witnesses *prior to* calling the victim herself, the prosecutor effectively precluded Modesitt from effective cross examination of these charges. The jury first heard and was allowed to consider, as substantive evidence, the victim's statements made to her mother many months prior to trial. At this point, Modesitt had not yet had an opportunity to cross examine the victim

---

1. Two questions were decided by the *Modesitt* court: 1) whether the *Patterson* rule was abused at Modesitt's trial; and 2) whether the *Patterson* rule should be overturned. The court addressed both questions because the new rule announced

in *Modesitt* was given prospective application and did not address Modesitt's complaints. The court held that the *Patterson* rule was abused and reversed Modesitt's convictions.

herself concerning these charges and, obviously, he could not cross examine the mother concerning the truthfulness of the charges which had been leveled by her daughter. This lack of ability to cross examine the veracity of the statements continued through the repetitive testimony of the welfare caseworker and the psychologist. Prior to putting the victim on the stand, the victim's veracity had been, in essence, vouchsafed by permitting the three witnesses to repeat the accusations of the victim.... Here, three witnesses told the victim's story before the victim herself testified. We hold, ... that we could not say that the drumbeat of the victim's original story did not unduly prejudice the jury which convicted Modesitt.

*Id.* at 651–52.

The prejudice here is even more obvious: M.B. did not testify at trial as to her allegations against Morris.[2] Therefore, due to counsel's failure to object to any of the testimony regarding M.B.'s out-of-court allegations, Morris was convicted solely on the basis of M.B.'s out-of-court statements. We therefore find that Morris was denied effective assistance of counsel and is entitled to a new trial.

The State does not refute Morris' argument that the testimony was inadmissible under *Modesitt*. Instead, the State argues that the evidence was merely cumulative; therefore, it was within the trial court's discretion to permit it. This argument ignores the holding in *Modesitt* and is without merit.

Reversed and remanded.

RILEY, J., concurs.

RUCKER, J., concurs in result.

---

**2.** The State requested to read M.B.'s statement instead of direct testimony "because [M.B.] is frightened to testify." (R. 327). Defense counsel agreed to the procedure, stating: "Because of her state today I think that is probably the only way we will get any testimony out of her." (R. 327).